**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
                                                       :
**NATALIE CALVELLO,**                                  :
                                                       :
                              **Plaintiff,**           :
                                                       :
              **-against-**                            :        **REPORT AND**
                                                       :        **RECOMMENDATION**
                                                       :        **05 Civ. 4254 (SCR)(MDF)**
**JO ANNE B. BARNHART,**                               :
**Commissioner of Social Security,**                   :
                                                       :
                              **Defendant.**           :
                                                       :
-----------------------------------------------------------------X

**TO:   THE HONORABLE STEPHEN C. ROBINSON, U.S.D.J.**

       Natalie Calvello brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

seeking judicial review of the final decision of the Commissioner of Social Security (the

"Commissioner"), finding that she was not entitled to childhood disability benefits or

supplemental security income ("SSI") benefits under the Social Security Act (the "Act").

Currently pending before the Court are Plaintiff's motion, and the Commissioner's cross-motion,

for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure

(Docs. ## 11, 12, 14, 15, 17).  Because I find that the Commissioner's decision regarding

Plaintiff's claims is supported by substantial evidence, I respectfully recommend that your

Honor deny the Plaintiff's motion, grant the Commissioner's cross-motion, and dismiss the case.

**I.    BACKGROUND**

       **A.    Procedural History**

       On May 11, 2001, Plaintiff applied for SSI benefits claiming disability since her birth on

May 16, 1983 due to a seizure disorder.  Administrative Record ("AR") 62-65.  Plaintiff's

application for SSI benefits was denied on November 1, 2001.  *Id.* 31-35.  Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ"), which was received by the Social Security Administration on January 14, 2002.  *Id.* 37.  Prior to the hearing, Plaintiff also filed an application for childhood disability benefits, which was consolidated with her SSI claim since both claims involved the same issue of whether Plaintiff was disabled under the Act.  *Id.* 10.  Following the October 18, 2002 hearing, the ALJ issued a decision on January 12, 2004, concluding that Plaintiff was not disabled within the meaning of the Act and denying her claims. *Id.* 10-22.  Plaintiff filed a request for review of the ALJ's decision with the Appeals Council on March 2, 2004.  *Id.* 6.  On February 25, 2005, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  *Id.* 3-5.

On April 29, 2005, Plaintiff commenced the instant action in this Court (Doc. # 1), alleging that the ALJ erroneously denied her application for childhood disability and SSI benefits.  After the Commissioner filed her Answer (Docs. ## 6, 8, 9), Plaintiff filed a motion for judgment on the pleadings, arguing that the ALJ's finding of not disabled is not supported by substantial evidence.  The Commissioner, in turn, cross-moved for judgment on the pleadings arguing that the ALJ's decision is, in fact, supported by substantial evidence.

### B.  Medical Evidence

#### 1.  Physical Impairments

On August 31, 1999, pediatric neurologist Dr. Ariel Sherbany examined Plaintiff to evaluate her seizure condition.  AR 211-12.  Dr. Sherbany noted that Plaintiff "is a sixteen-year-old girl with history of prematurity, seizures, and recent complications of herniated cervical disc and hemarthrosis of the right knee."  *Id.* 211.  Plaintiff had been seizure-free for over two years

while taking the seizure medication Lamictal, and now complained of a recurrence of seizure symptoms to Dr. Sherbany. *Id.* Plaintiff admitted that without consulting her parents or doctor, she had stopped taking her seizure medication in early August 1999. *Id.* This was confirmed by a test indicating that Plaintiff had no detectable Lamictal level. *Id.* Dr. Sherbany attributed the recurrence of seizures to Plaintiff's noncompliance in taking her medication. *Id.* 212. Dr. Sherbany suggested that Plaintiff remain on Lamictal "for a long time" and indicated that Plaintiff was "determined at this time to remain compliant." *Id.*

Plaintiff was subsequently hospitalized at the Westchester Medical Center from August 27 to August 29, 2000 with post-fall knee pain and swelling. *Id.* 166-76, 201. The attending physician examined Plaintiff, observing right knee and foot edema, and ordered a magnetic resonance imaging ("MRI") scan of the knee. *Id.* 166, 169-70, 172. Plaintiff's discharge diagnosis was a subluxation of the right patella; she was prescribed Vicodin and a knee brace. *Id.* 166-67.

Plaintiff received further treatment for chronic dislocations of the right knee from Dr. Stephen Nicholas, an orthopedic surgeon, beginning on September 7, 2000, through August 24, 2001. *Id.* 240-47. In his initial consultation, Dr. Nicholas noted that Plaintiff's medical history revealed epilepsy and attention deficit hyperactivity disorder, and further, that Plaintiff had undergone surgery for discectomy and fusion of the C5-6 cervical spine at age 16 to treat a subluxation and herniated disc. *Id.* 240; *see id.* 214-20. Dr. Nicholas prescribed physical therapy to "increase her strength, decrease swelling and decrease pain" with a follow-up evaluation in one month. *Id.* 240.

Plaintiff realized only mild improvement after one month of physical therapy, leading Dr.

Nicholas to schedule Plaintiff for arthroscopic lateral release surgery, which was completed on November 22, 2000 with no complications. *Id.* 241-44. On December 21, 2000, Plaintiff returned to Dr. Nicholas for a follow-up examination and reported that she had fallen on ice, injuring her knee, and was unable to extend it. *Id.* 245. After examining Plaintiff, Dr. Nicholas recommended an MRI scan of the knee based on his impression that Plaintiff had a "[p]ossible partial quadriceps tear versus patellar tendon tear." *Id.* 245. Results of the MRI scan "reveal[ed] hemorrhage in the lateral retinaculum, otherwise no acute problems." *Id.* 246. Dr. Nicholas examined Plaintiff again on August 24, 2001, and noted that she continued to have problems with her knee, experiencing two dislocations since the lateral release surgery in November 2000. *Id.* 247. Dr. Nicholas prescribed a knee brace and noted that if she did not improve, Plaintiff would require an open proximal distal realignment. *Id.*

On June 14, 2001, Dr. Marcia Nackenson from Children's Physicians of Westchester submitted a report indicating that she had first examined Plaintiff on September 21, 2000, and had last seen Plaintiff on November 20, 2000. *Id.* 188. Dr. Nackenson diagnosed Plaintiff with seizure disorder, asthma, ADHD, anxiety, C5-C6 discectomy, and patellar tendon tear, and noted that Plaintiff exhibited symptoms consisting of intermittent dyspnea, C-spine pain, and right knee pain, and further, that Plaintiff experienced a decreased range of motion in her neck and right knee. *Id.* 188-89. With respect to Plaintiff's ability to do work-related physical activities, Dr. Nackenson was of the opinion that she had no limitation in her ability to lift and carry or to sit. *Id.* 190-91. Dr. Nackenson found Plaintiff's ability to "stand and/or walk" and to "push and/or pull" was limited by knee pain, however, the doctor did not specify the extent of the limitation. *Id.*

On March 16, 2001, Plaintiff was admitted to the Westchester Medical Center where she was examined by pediatric neurologist, Dr. S. Kim, upon complaints of thumb twitching over the last three to four months. *Id.* 158-60. After an electroencephalogram (EEG) did not reveal any seizures, Dr. Kim concluded that the twitching was possibly associated with an increased level of Lamictal. *Id.* Dr. Kim prescribed a decreased dose of Lamictal and directed that Plaintiff follow up with her physician, Dr. Sherbany, in one week to address her Lamictal level. *Id.*

Dr. Vijaya Doddi, a consulting orthopedic physician, examined Plaintiff on September 13, 2001. *Id.* 248. Under "Activities of Daily Living," Dr. Doddi reported that Plaintiff had "difficulty with heavy lifting and other chores" and that "[s]he does not drive." *Id.* 249. Dr. Doddi noted that Plaintiff experienced a limited range of motion in her cervical spine and right knee. *Id.* 249-50. After his examination, Dr. Doddi concluded that Plaintiff experienced no restriction for use of her hands, moderate restrictions for "heavy lifting, prolonged sitting and walking for prolonged periods, standing for prolonged periods, carrying and lifting heavy weights, bending, climbing, going into high places, and using dangerous machinery." *Id.* 251.

Pediatric pulmonologist, Dr. Allen Dozor, completed a medical questionnaire concerning Plaintiff in September 2001. *Id.* 224-30. Dr. Dozor indicated he had treated Plaintiff every two to four months since May 1987. *Id.* 226. Dr. Dozor's diagnoses included asthma, COPD (chronic obstructive pulmonary disease), and chronic sinusitis. *Id.* Dr. Dozor provided further information about Plaintiff's medical background, however, he indicated that he could not provide a medical opinion regarding Plaintiff's ability to do work-related activities, and also indicated that Plaintiff had no other conditions significant to recovery. *Id.* 229.

In October 2001, state agency medical consultant, Dr. Richard Blaber, reviewed

Plaintiff's medical history in order to provide his opinion as to Plaintiff's residual functional capacity. *Id.* 253. Upon his review of the evidence, Dr. Blaber concluded that Plaintiff was capable of lifting twenty pounds occasionally and ten pounds frequently. *Id.* Dr. Blaber also found that Plaintiff could sit for approximately six hours, and stand or walk for approximately two hours, in a typical eight-hour day. *Id.*

On August 24, 2001, Plaintiff was examined by Dr. Nicholas in response to a complaint that she had dislocated her patella twice since surgery on the knee in November 2000. *Id.* 247. Dr. Nicholas prescribed a knee brace and directed that Plaintiff should continue strengthening the knee. He cautioned that surgery might be required if Plaintiff's knee did not improve. *Id.* Subsequently, on October 5, 2001, Plaintiff visited Dr. Nicholas and reported that she had dislocated her knee again. *Id.* 333. Dr. Nicholas examined Plaintiff and concluded that her chronic knee instability would require further surgery. *Id.* Dr. Nicholas performed surgery to correct her recurrent knee dislocations on December 19, 2001. *Id.* 291, 293, 329-30.

After successfully completing the operation, Dr. Nicholas saw Plaintiff again on February 14, 2002, for a follow-up examination. *Id.* 328. At this examination, Dr. Nicholas found Plaintiff neurologically intact, with mild spasm in the left paralumbar region, or lower back pain, as complained of by Plaintiff. *Id.* Dr. Nicholas attributed these low back spasms to "secondary postural changes" caused by Plaintiff's posture change when walking with the knee brace. *Id.* Dr. Nicholas recommended that Plaintiff stop using the knee brace, continue with a back exercise program, and return for a follow-up visit in four weeks. *Id.*

Dr. Nicholas saw Plaintiff on May 3, 2002, and noted that "[s]he stated that she was doing great, with no buckling episodes and just mild aching pain." *Id.* 327. Subsequently on

December 4, 2002, Dr. Nicholas performed arthroscopic surgery and removed two screws from Plaintiff's right knee that had been causing her pain. *Id.* 325-26. During Plaintiff's examination on December 13, 2002, Dr. Nicholas removed the sutures from the December 4th surgery and noted that the wounds were "well healed" and assessed that she was "doing very well." *Id.* 324.

On March 10, 2003, Plaintiff saw Dr. Nicholas for a new problem with right hip pain. *Id.* 323. During this visit, Plaintiff "stated that her knee has been doing well, except when it gets cold, then she has some pain." *Id.* On examination, Dr. Nicholas found tenderness over the right gluteus medius and diagnosed right gluteus medius tendonitis, for which he referred Plaintiff to physical therapy. *Id.*

On September 22, 2003, Plaintiff was examined by Dr. Nicholas upon her complaint that her knee had been painful and that she had dislocated her right patella twice since her last surgery. *Id.* 334. His assessment was of recurrent dislocating patella for which he prescribed a knee brace, and cautioned that if she does not show improvement additional surgery may be required. *Id.*

## 2.    Mental Impairments

Somers High School psychologist Dr. Cynthia Maloney evaluated Plaintiff on September 22 and 26, 2000. *Id.* 145-50. Dr. Maloney noted that Plaintiff participated in a resource program that provided "[p]rogram modifications for Natalie includ[ing] preferential seating. Testing modifications allow for special location, use of computer, questions read and explained, extended time (2x), and use of calculator." *Id.* 145. Results of Plaintiff's Intelligence Quotient ("IQ") testing placed her in the Average range for Verbal IQ (score 105, 63rd percentile), Low Average range for Performance IQ (score 85, 16th percentile), and Average range for Full Scale

IQ (score 97, 42nd percentile) using the Wechsler Adult Intelligence Scale-III. *Id.* 148. Dr.

Maloney noted that the 20-point discrepancy between Plaintiff's verbal and performance IQ

scores was the result of uneven development of cognitive skills, indicating a learning disability.

*Id.* 148-49. Dr. Maloney concluded:

> Natalie is a 17 year old high school senior who has a long term
> history of health and learning problems. Many supports, services
> and interventions have been in place for her over the years.
> Natalie has grown into a young woman who has successfully
> completed a regents curriculum and is ready to take on the
> challenges of a college program. She feels she would benefit from
> continued services on the college level.

*Id.* 150.

In a letter dated June 29, 2001, psychologist Dr. Eileen Chieco indicated that she had

treated Plaintiff regularly beginning in December 1995 through December 1996, and beginning

again in February 2000 through the date of the letter, June 29, 2001. *Id.* 208. However, Dr.

Chieco indicated that recent treatment had been sporadic due to Plaintiff's "busy school and

work schedule during the past few months . . . ." *Id.* Dr. Chieco diagnosed Plaintiff with ADHD

and Anxiety Disorder "NOS" (not otherwise specified). *Id.* Dr. Chieco opined that during her

sessions, while Plaintiff was thoughtful and able to "make important connections between

feelings and behaviors, and between behaviors and consequences, she cannot be relied upon to

make good judgments based on these insights." *Id.* Finally, Dr. Chieco concluded that the

social, emotional, and academic supports received by Plaintiff were essential to her continued

success, and that Plaintiff, when stressed, "can be very impulsive and make poor decisions . . ."

in a classroom, work or social setting. *Id.*

Dr. George Popper, a consulting examiner, conducted a psychological evaluation of

Plaintiff on August 13, 2001, to determine her ability to do work-related activities. *Id.* 221. Dr. Popper noted that Plaintiff was accompanied by her mother to the evaluation and that, while Plaintiff answered most questions about herself, her mother also responded to some of them, and her mother had to complete the simple intake form since Plaintiff had difficulty reading and completing it herself. *Id.* Plaintiff indicated to Dr. Popper that she had trouble concentrating and focusing for extended periods of time, however, Dr. Popper noted that she had no problem answering his questions and that she appeared "oriented as to time and place and her thought processes were coherent and lucid." *Id.* During the examination, Plaintiff indicated to Dr. Popper that she could drive a car and that she believed she could learn to cook, do her own laundry, and use public transportation if taught. *Id.* 222. Dr. Popper noted that Plaintiff's test scores suggested her reading and math skills were approximately on grade level, and while Dr. Popper did not have IQ scores available, he recorded his impression that Plaintiff was "functioning within the Low Average to Borderline range of intelligence." *Id.* In his recommendations, Dr. Popper opined that Plaintiff was motivated to attend college and that she would probably do well given the program description. *Id.* 223. He further suggested that Plaintiff continue her psychotherapy and indicated that she "could use some training and encouragement to do more things for herself, e.g., cooking, cleaning, laundry, etc." and that "[w]ith appropriate training, [Plaintiff] could be self-sufficient and competitively employable." *Id.*

A state agency psychiatric consultant, Dr. James Alpert, reviewed evidence of Plaintiff's mental disability on September 13, 2001. *Id.* 255. Dr. Alpert determined that Plaintiff's anxiety disorder and ADHD failed to meet the criteria for establishing a disability under the regulations.

*Id.* 260, 262; *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.06 and 12.07.  Dr. Alpert rated

Plaintiff's functional limitations as follows:  restriction of activities of daily living, mild;

difficulties in maintaining social functioning, moderate; difficulties in maintaining concentration,

persistence, or pace, moderate.  *Id.* 265.  In the narrative explaining his findings, Dr. Alpert

discussed the evidence before him, which included a report from Plaintiff's teacher, a school

psychological evaluation, and reports from both a treating psychologist and a psychological

consultant.  *Id.* 271.  After reviewing these sources, Dr. Alpert concluded that Plaintiff was

significantly limited, however, her medical history and reports from medical sources, including

her treating psychologist, "leave her with the mental residual capacity to carry out work

procedures at a consistent pace.  She is able to relate adequately to coworkers and supervisors []

in a low contact setting."  *Id.* 272.  He concluded that "[s]he does not come close to reaching

criteria for mental retardation."  *Id.*

> **C.**     <u>Other Evidence</u>

Plaintiff was born on May 16, 1983, and is a high school graduate.  AR 23, 62, 90.  At

the hearing, Plaintiff testified that she was disabled due to a learning disability, attention deficit

disorder (ADD), a seizure disorder, asthma, neck pain, and knee problems.  *Id.* 348.  She said her

ADD distracted her and made it hard for her to focus or concentrate.  *Id.* 348-49.  Plaintiff also

testified that she took medication for her seizure disorder but had not had a seizure in three and a

half years.  *Id.*  She testified that she had upper respiratory problems and experienced shortness

of breath, but that she took medication for her symptoms as needed.  *Id.* 388-89.  Plaintiff

testified that following the surgery done on her neck in 1999, she did not have any problems with

her neck, and she took Advil to relieve any pain she felt.  *Id.* 375-76.  She testified that because

of her two knee surgeries, she could not sit for very long without her knee getting stiff, and that she could not walk for more than two blocks without having to stop because of knee pain. *Id.* 353-54, 362-63, 379.

Plaintiff testified that as a full-time student at Iona College, she attended twelve classes per week, each lasting fifty-two minutes, as well as at least two hours of tutoring sessions, and that she studied at home for approximately two hours each night. *Id.* 349-51, 354. She testified that she used a computer to do research and write her papers and that she had someone take notes for her since her notes were "very disorganized." *Id.* 360, 366. She also took tests separate from the rest of the class in a private room where she had unlimited time, someone was available to read and explain the questions, and she was able to use a calculator and a computer. *Id.* 366-67. Plaintiff testified that her mother helped her with her homework. *Id.* 368-69.

Plaintiff testified that she was able to drive to college, as well as to friends' houses and doctors' appointments. *Id.* 352-53, 355. She said she could probably take public transportation if she had to. *Id.* 357. She testified that on the weekends, she would socialize with friends, sometimes see movies, and watch football on TV. *Id.* 360-61, 365; *see also id.* 96 (Plaintiff did grocery shopping once a week, cooked 3-4 times a week, cleaned her room, did household chores, listened to music, watched TV, and regularly socialized with friends and family). However, Plaintiff testified that she had few friends due to her short temper and impulsive nature. *Id.* 364-65.

Plaintiff's mother testified that she helped Plaintiff with her college schoolwork at home, keeping her focused and organized, and reminding her when long-term assignments were due. *Id.* 393-94. She testified that every morning, she would leave detailed lists for Plaintiff of

Plaintiff's appointments for the day and chores that Plaintiff had to do around the house, broken down into individual steps, to insure that Plaintiff would complete them.  *Id.* 395.  Plaintiff's mother testified that Plaintiff had attempted a few jobs, but none had worked out because of her inability to concentrate and work independently.  *Id.* 402-05, 407.

A service coordinator for the Westchester County Department of Mental Health, Len Salvatore, testified that Plaintiff received services under the Individuals with Disabilities Education Act.  *Id.* 411-12.  Salvatore testified that his job was to ensure that Plaintiff received all necessary educational services to which she was entitled throughout her high school and college career.  He testified that Plaintiff received nursing services to monitor her seizure medications, but that these services were discontinued in 1998 when Plaintiff was able to self-medicate.  *Id.* 411.  When asked why he felt Plaintiff was disabled, Salvatore responded that she had many problems coping with her surroundings and needed support in all areas, without which she would not be able to function in society.  *Id.* 410.

While Plaintiff was in high school, the Somers Central School District's Committee on Special Education and Recommendations completed an Individualized Education Program ("IEP") for her during the 2000-01 school year.  *Id.* 139-44.  Under the IEP, Plaintiff was to receive preferential seating and testing modifications including extended time, use of a calculator and computer, questions read and explained, and a special location to take tests.  *Id.* 139.  The IEP noted that Plaintiff's disability affected her academic progress as she was easily distracted, impulsive, and had difficulty organizing her ideas and including sufficient details in writing assignments.  *Id.*  The IEP also stated that Plaintiff had minimal need for supervision or support and that her speech and language skills were age-appropriate.  *Id.* 140-41.  Plaintiff's resource

room teacher, Barbara Russ, completed a questionnaire pertaining to Plaintiff's disability on June 13, 2001. *Id.* 132-36. She indicated that she saw Plaintiff for forty minutes each day, Monday through Friday. *Id.* 132. Russ reported that Plaintiff was impulsive and easily distracted, and sometimes "exhibits poor frustration tolerance . . ." when faced with a difficult task or a rule with which she disagrees. *Id.* She noted that Plaintiff's teachers had written referrals for her insubordinate behavior twice in the previous year, and once in the current year. *Id.*

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   Standard of Review

The scope of review in an appeal from a social security disability determination involves two levels of inquiry. First, the court must review the Commissioner's decision to determine whether the Commissioner applied the correct legal standard when determining that the plaintiff was not disabled. *See Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999). Failure to apply the correct legal standard is grounds for reversal of the ruling. *See Townley v. Heckler,* 748 F.2d 109, 112 (2d Cir. 1984). Second, the court must decide whether the Commissioner's decision was supported by substantial evidence. *See Green-Younger v. Barnhart,* 335 F.3d 99, 105-06 (2d Cir. 2003). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 106 (internal quotation marks and citations omitted). When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides." *Tejada,* 167 F.3d at 774 (citing *Quinones v. Chater,* 117 F.3d 29, 33 (2d Cir. 1997)). "It is not the function of a reviewing court to decide *de novo* whether a claimant

was disabled." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted). If the

"decision rests on adequate findings supported by evidence having rational probative force, [this

Court] will not substitute [its own] judgment for that of the Commissioner." *Veino v. Barnhart,*

312 F.3d 578, 586 (2d Cir. 2002). Moreover, the ALJ "has an obligation to develop the record in

light of the non-adversarial nature of the benefits proceedings, regardless of whether the claimant

is represented by counsel." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citations

omitted).        **B.        Determining Disability**

In the context of either disability benefits or SSI, the Act defines "disability" as the

inability "to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§

423(d)(1)(A), 1382c(a)(3)(A). In evaluating a disability claim, regulations issued pursuant to the

Act set forth a five-step process that the Commissioner must follow. *See* 20 C.F.R. §§

404.1520(a)(4), 416.920(a)(4).

First, the Commissioner will consider whether the claimant is working in "substantial

gainful activity." *Id.* at §§ 404.1520(a)(4)(i),(b); 416.920(a)(4)(i),(b). If the claimant is engaged

in "substantial gainful activity," then the Commissioner will find that the claimant is not

disabled. *Id.* Second, the Commissioner considers the medical severity of the claimant's

impairments. *Id.* at §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The claimant's impairment will not

be deemed severe "[i]f [she] do[es] not have any impairment or combination of impairments

which significantly limits [her] physical or mental ability to do basic work activities." *Id.* at §§

404.1520(c), 416.920(c). Third, if it is found that the claimant's impairments are severe, the

Commissioner will determine if the claimant has an impairment that meets or equals one of the impairments presumed severe enough to render one disabled, listed in Appendix 1 to Part 404, Subpart P of the Social Security Regulations. *See id.* at §§ 404.1520(a)(4)(iii),(d); 416.920(a)(4)(iii),(d). If the claimant's impairments are not on the list, the Commissioner considers all the relevant medical and other evidence and decides the claimant's residual functional capacity. *See id.* at §§ 404.1520(e), 416.920(e). Then, the Commissioner proceeds to the fourth step to determine whether the claimant can do her past relevant work. *See id.* at §§ 404.1520(a)(4)(iv),(e)-(f); 416.920(a)(4)(iv),(e)-(f). Finally, if it is found that the claimant cannot do her past relevant work, the Commissioner will consider the claimant's residual functional capacity, age, education, and work experience to see if she can make an adjustment to other work. *See id.* at §§ 404.1520(a)(4)(v),(g); 416.920(a)(4)(v),(g).

The claimant bears the burden of proof on the first four steps of this analysis. *See DeChirico v. Callahan,* 134 F.3d 1177, 1180 (2d Cir. 1998) (citation omitted). If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he need not proceed with the remaining steps. *See Williams v. Apfel,* 204 F.3d 48, 49 (2d Cir. 2000). If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of other work. *See DeChirico,* 134 F.3d at 1180 (citation omitted).

## III.    DISCUSSION

In deciding Plaintiff's case, the ALJ correctly applied the five-step sequential analysis set forth in the regulations. First, he found that Plaintiff had not engaged in any substantial gainful activity since the alleged onset date of her disability. AR 13. Second, the ALJ determined that Plaintiff's impairments, consisting of "Attention Deficit Disorder (ADD), seizure disorder,

asthma, cervical discogenic disorder, dislocated patella, right are considered 'severe' based on the requirement in the Regulations 20 C.F.R. §§ 404.1520(c) and 416.920(b)," and therefore, significantly limited her ability to do basic work activities. *Id.* 21; *see also id.* 13-14, 20. Third, the ALJ considered whether Plaintiff's impairments met or equaled the medical criteria of any of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Social Security Regulations and found that they did not. *Id.* 17, 21.

Having found that Plaintiff's impairments did not meet or equal the medical criteria of any of the listed impairments, the ALJ went on to determine Plaintiff's residual functional capacity and concluded that Plaintiff had the residual functional capacity to perform a full range of sedentary work. *Id.* 21. He found that Plaintiff was able to "lift[,] carry, push[,] pull up to 20 pounds, sit up to 6 hours, stand and walk up to 2 hours, understand, remember and carry-out simple instructions, use judgement for simple tasks, interact and respond appropriately to supervisors and co-workers, and deal effectively to [sic] routine changes in a work setting." *Id.* 19-20.

At the fourth step in the analysis, the ALJ found that Plaintiff had no past relevant work. *Id.* 20. Consequently, the ALJ proceeded to the final step in the sequential analysis. At the fifth step, "the burden shifts to the Commissioner . . . to show that the claimant can perform other jobs that exist in significant numbers in the national economy." *Id.* The ALJ noted that at this step, he would apply the medical vocational guidelines (the "grids") contained in 20 C.F.R. Pt. 404, Subpt. P, App. 2, taking into account Plaintiff's residual functional capacity, age, education, and work experience. *Id.* He found that Plaintiff's exertional limitations were consistent with the ability to perform sedentary work and that her non-exertional mental limitations did not

substantially erode the occupational base for sedentary work. *Id.* Since she was twenty years old at the time of the decision, under the regulations, she was a younger individual between the ages of 18 and 44. *Id.* (citing 20 C.F.R. §§ 404.1563, 416.963). She also had a high school, or high school equivalent, education with no transferable skills since she had not performed any past relevant work during the relevant time period. *Id.* Based on the foregoing, the ALJ determined that medical vocational Rule 201.27 applied as a framework for decision-making and that it directed a conclusion that Plaintiff was not disabled. *Id.*

The only apparent dispute between the parties concerns the fifth step in the sequential analysis. While Plaintiff's memorandum of law is not specific, it appears that the focus of her attack is on the ALJ's assessment of her non-exertional impairments. Plaintiff asserts that the ALJ's determination that her non-exertional impairments did not impact her ability to perform substantially all of the full range of sedentary work was not supported by substantial evidence. *See* Pl.'s Mem. of Law in Supp. of Mot. at 13. Plaintiff claims that the ALJ "did not provide a rational basis for his finding that the [Plaintiff's] capacity for even sedentary work has not been compromised by any non-exertional impairment." *Id.* at 23. Plaintiff further argues that the ALJ should have "taken advantage of vocational expert testimony, as required when a significant non-exertional impairment exists so as to make application of the [grids] inappropriate." *Id.* Plaintiff continues this argument in her reply brief, arguing that the "evidence, fairly considered in its entirety, shows that the claimant's non-exertional impairments were far from 'negligible' but rather caused a substantial reductions [sic] (loss) in the Plaintiff's abilities to perform such basic work-related functions . . . " as her ability to concentrate, remember work procedures, work in proximity to others without being distracted, complete an entire day or week without

psychological interruptions, respond appropriately to criticism, and sustain an ordinary routine without special supervision. Pl.'s Reply to Def.'s Cross-Mot. at 3-4.

"In the ordinary case, the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986). The grids take[] into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience." *Rosa v. Callahan,* 168 F.3d 72, 78 (2d Cir. 1999) (internal quotation marks and citations omitted). The Second Circuit has held that "the mere existence of a nonexertional impairment does not automatically require the production of a vocational expert nor preclude reliance on the guidelines." *Bapp v. Bowen,* 802 F.2d 601, 603 (2d Cir. 1986). Rather, "application of the grid guidelines and the necessity for expert testimony must be determined on a case by case basis." *Id.* at 605. "Accordingly, where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment the application of the grids is inappropriate. By the use of the phrase 'significantly diminish' we mean the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id.* at 605-06 (footnote omitted).

The court in *Bapp* remanded to the ALJ because "[t]he ALJ failed to consider the intermediate question – whether the range of work Bapp could perform was so significantly diminished as to require the introduction of vocational testimony." *Id.* at 606. In the instant case, the ALJ appropriately addressed this intermediate question, stating that "[t]he nonexertional mental limitations do not substantially erode the occupational base for sedentary work, as the claimant understands, remembers and can carry-out [sic] simple instructions, use

18

judgment for simple tasks, interact and respond appropriately to supervisors and co-workers and deal effectively with routine changes in a work setting." AR 20 (citing SSR 85-15 and SSR 96-9p). Hence, Plaintiff's reliance on *Nelson v. Bowen,* 882 F.2d 45 (2d Cir. 1989), *see* Pl.'s Reply to Def.'s Cross-Mot. at 5, is simply misplaced. That case involved a remand for an individualized evaluation at the fifth step of the sequential analysis because the claimant was found unable even to do sedentary work. Here, not only did the ALJ find that Plaintiff had the residual functional capacity to perform sedentary work based on her exertional limitations, but he also determined that Plaintiff's work capacity was not significantly diminished by her nonexertional mental limitations. *See* AR 20. Consequently, the ALJ moved appropriately to an application of the grid guidelines. *Id.* ("The claimant's capacity for sedentary work is substantially intact and has not been compromised by any nonexertional limitations. Therefore, using the above-cited rule [Medical-Vocational Rule 201.27] as a framework for decision-making, the claimant is not disabled.").

In arriving at his conclusion, the ALJ considered the opinions of treating, examining, and consulting physicians and psychologists, along with Plaintiff's own testimony, IQ scores, and educational history. AR 19-20. Based on a review of the entire record, as summarized in detail in Sections I.B. and I.C., *supra*, as well as in the ALJ's Decision, *see* AR 10-22, there is substantial evidence supporting the ALJ's finding regarding Plaintiff's residual functional capacity, *i.e.*, that Plaintiff could lift, carry, push and pull up to 20 pounds; sit for up to 6 hours; stand and walk for up to 2 hours; understand, remember and carry out simple instructions; use judgment for simple tasks; interact and respond appropriately to supervisors and co-workers; and deal effectively with routine changes in a work setting. *Id.* 19-20. More specifically, the ALJ

reasonably relied upon Plaintiff's Full Scale IQ score, which demonstrated average intelligence; her ability to maintain passing grades in college; the testimony of Plaintiff and her mother regarding Plaintiff's daily activities, which "reflect the claimant's ability to maintain adequate concentration, to complete routine simple tasks, make decisions, and maintain social relationships," *id.* 17; and the reports from Dr. Popper, the consulting examiner, and Dr. Alpert, the state psychiatric consultant, in reaching his conclusion that Plaintiff did not suffer a substantial loss of mental ability which would impact her capacity to perform sedentary work.

Plaintiff contends that the ALJ should have given more credit to the opinion of Dr. Chieco, a treating psychologist, or alternatively, that the ALJ should have further developed the record by obtaining additional treatment information from Dr. Chieco. *See* Pl.'s Mem. of Law in Supp. of Mot. at 20. However, the ALJ noted that Dr. Chieco's opinion was conclusory and "provid[ed] very little explanation of the evidence relied on in forming that opinion. Indeed, Dr. Chieco failed to include a comprehensive mental status examination to support the existence of an anxiety disorder." AR 15. He also noted that Dr. Chieco's treatment of Plaintiff had been sporadic since resuming in February 2000, due to Plaintiff's conflicting work and school schedule, and that "[a]pparently the claimant's work and school activity took precedence over the need for treatment, which shows the anxiety disorder did not impose any restrictions on the claimant's ability to engage in work activity." *Id.* The ALJ thus concluded that "Dr. Chieco's report is of limited probative value in establishing a severe anxiety disorder, and instead reflects the existence of a nonsevere mental impairment." *Id.* Furthermore, the ALJ went on to note the finding of Dr. Popper, the consulting examiner, who found no evidence of an underlying emotional or anxiety disorder. *Id.* Finally, in her own testimony, Plaintiff did not point to

anxiety as a reason why she thought she was disabled. *Id.* 348-49.

Moreover, despite Plaintiff's claim of a "perceived evidentiary gap," Pl.'s Mem. of Law in Supp. of Mot. at 20, the record contains evidence that "every reasonable effort" was made to develop Plaintiff's medical history in this case. *See* 20 C.F.R. §§ 404.1512(d), 416.912(d).[1] The regulations define "every reasonable effort" to mean that the Social Security Administration "will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one followup request to obtain the medical evidence necessary to make a determination." *Id.* Correspondence was sent to Dr. Chieco in an attempt to obtain her clinical findings and an assessment of Plaintiff on May 31, 2001, and again on June 26, 2001. AR 26. Dr. Chieco responded to the request with the June 29, 2001 report referenced by the ALJ in his decision. *Id.* 26, 208-09.

Plaintiff also contends that the ALJ erred by not addressing the failure of her college to complete the school activities questionnaire. Pl.'s Mem. of Law in Supp. of Mot. at 21. However, the regulations require only that the Commissioner assist Plaintiff in the development of medical history, which would not include information from educational facilities. *See* 20 C.F.R. §§ 404.1512(d), 416.912(d). Moreover, not only does Plaintiff recognize that this questionnaire is "apparently designed for completion by primary and secondary schools rather than college level sources," Pl.'s Mem. of Law in Supp. of Mot. at 21, but in any event, she was

---

[1]Notably, not only did the Social Security Administration, prior to the hearing in this case, "request[] and secure[] medical reports from the treating sources listed by the claimant, and ha[ve] her examined by consulting physicians at the Administration's behest and expense," but "[a]s part of post-hearing development, the [ALJ] granted counsel's request and held the record open for an extended period up through October 13, 2003 for the submission of updated medical reports from the claimant's treating sources and school reports." AR 11.

able to provide testimony at the hearing concerning the special services she received in college. *See* AR 349-52, 366-67.

Plaintiff argues that in assessing her mental impairments, the ALJ placed undue emphasis on her ability to graduate high school and maintain passing grades in college without properly recognizing that she received a variety of supports.  Pl.'s Mem. of Law in Supp. of Mot. at 21. However, the ALJ had before him evidence in the record concerning the supportive services received by Plaintiff both in high school, *id.* 145-50, and college, *id.* 349-52, 366-67, but found that "[w]hile the claimant does require supportive services in order to attend college, nevertheless she is able to maintain a passing GPA."  AR 19.  Moreover, the ALJ took into account the evidence of the academic supports Plaintiff received in concluding that Plaintiff had the residual functional capacity to "understand, remember and carry-out [sic] *simple* instructions" and "use judgment for *simple* tasks."  *Id.* 19-20 (emphases added).

Plaintiff argues that the ALJ erred by not finding credible both Plaintiff's and her mother's testimony regarding Plaintiff's alleged mental impairments and by not properly considering her subjective complaints of pain and other symptoms.  Pl.'s Mem. of Law in Supp. of Mot. at 22, 25-26.  However, an ALJ's credibility findings are entitled to deference by a reviewing court.  *See Tejada*, 167 F.3d at 775-76 (upholding ALJ's credibility determination, citing with approval *Pascariello v. Heckler*, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985), in which the district court noted "that after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, the ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment."); *see also Aponte v. Sec'y, Dep't of Health & Human Servs.,* 728 F.2d 588, 591 (2d Cir. 1984) ("It is the

function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant. If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain.") (internal quotation marks and citation omitted). In rendering his decision in this case, the ALJ carefully considered all of Plaintiff's subjective complaints concerning both her mental and physical limitations, giving detailed reasons why he believed they were not entitled to great weight, and such findings are supported by substantial evidence in the record. *See* AR 17-19 (including citations to record evidence). Consequently, there is no basis to disturb these findings.

In sum, the ALJ applied the proper legal standard in his determination that Plaintiff was not disabled, and his decision is supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that your Honor deny Plaintiff's motion, grant the Commissioner's cross-motion, and dismiss the case.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Rule 72(b), Fed. R. Civ .P., the parties shall have ten (10) days, plus an additional three (3) days, pursuant to Rule 6(e), Fed. R. Civ. P., or a total of thirteen (13) working days, (*see* Rule 6(a), Fed. R. Civ. P.), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Stephen C. Robinson, at the United States Courthouse, 300 Quarropas Street, White

Plains, New York 10601, and to the chambers of the undersigned at 300 Quarropas Street, White Plains, New York 10601.

Failure to file timely objections to the Report and Recommendation will preclude later appellate review of any order to judgment that will be entered by Judge Robinson. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of H.H.S.*, 892 F.2d 15, 16 (2d Cir. 1989) (*per curiam*); *Wesolek v. Canadair, Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988). Requests for extensions of time to file objections must be made to Judge Robinson and should not be made to the undersigned.

Date:    April 29, 2008
         White Plains, New York


Respectfully submitted,


MARK D. FOX
UNITED STATES MAGISTRATE JUDGE


Copies of the foregoing report and recommendation have been sent to the following:

The Honorable Stephen C. Robinson, U.S.D.J.

Herbert S. Forsmith, Esq.
26 Broadway, 17th Floor
New York, New York 10004

John E. Gura, Jr., Esq.
United States Attorney's Office
Southern District of New York
86 Chambers Street
New York, New York 10007